## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x
|  |  |  |
| --- | --- | --- |
| **In re** | : | **Chapter 11** |
|  | : |  |
| **DSI HOLDINGS, INC., et al.,**[1] | : | **Case No. 11– _____ (   )** |
|  | : |  |
| **Debtors.** | : | **(Joint Administration Requested)** |
|  | : |  |

-----------------------------------------------------------x

## DEBTORS' MOTION FOR INTERIM AND FINAL (I) AUTHORITY TO OBTAIN POSTPETITION FINANCING; (II) AUTHORITY TO USE CASH COLLATERAL; (III) AUTHORITY TO GRANT SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (IV) AUTHORITY TO PROVIDE ADEQUATE PROTECTION; AND (V) MODIFICATION OF THE AUTOMATIC STAY

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

DSI Holdings, Inc. ("DSI") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors" or "DEB"), respectfully represent:

### Background

1.      On the date hereof (the "Commencement Date"), each of the Debtors commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in this Court. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

---

[1] The last four digits of DSI Holdings, Inc.'s federal tax identification number are 9441. The mailing address for DSI Holdings, Inc. is 9401 Blue Grass Road, Philadelphia, PA 19114. Due to the large number of Debtors in these cases, for which the Debtors have requested joint administration, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed noticing and claims agent at http://www.kccllc.net/debshops.

Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Code for the District of Delaware (the "Local Rules").

## DEB's Business

3.      DEB is a specialty retail chain that operates 318 stores in the junior "fast fashion" market.  Additional information about the Debtors can be found in the *Declaration of Barry J. Susson in Support of the First-Day Motions and Applications*, filed concurrently herewith (the "First Day Declaration").

## Relief Requested[2]

4.      By this motion (the "Motion"), the Debtors request, pursuant to sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(c), and 9014, entry of the proposed interim order (the "Interim Order") substantially in the form attached hereto as Annex A, and entry of a proposed final order (the "Final Order," and together with the Interim Order, the "DIP Orders") to be filed prior to the date of the final hearing on the Motion (the "Final Hearing"), (a) authorizing Deb Shops, Inc., a Pennsylvania corporation, ("Deb Shops" or the "Borrower") to obtain postpetition loans, advances and other financial accommodations, in an aggregate committed amount of up to $15 million, on an interim basis (the "Interim DIP Facility") for a period through and including the Final Hearing, and up to $21.7 million on a final basis, subject to further approval of the DIP Lenders (as defined below) (the "Final DIP Facility," and together with the Interim DIP Facility, the "DIP Facility") from Ableco, L.L.C. ("Ableco"), in its capacities as administrative agent and collateral agent (in such capacities, collectively, the "DIP Agent") for itself and the DIP Lenders (as defined below) in

---

[2] All capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the DIP Credit Agreement.

RLF1 4081824v. 1

accordance with the DIP Loan Documents (as defined below), secured by security interests in and liens upon the Collateral pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code; (b) authorizing the Debtors to enter into, be bound by, and perform under the revolving debtor in possession credit facility, entitled "Financing Agreement" dated June 24, 2011 by and among the Borrower, certain subsidiaries of DSI as guarantors, the DIP Agent, and the lenders from time to time party thereto (the "DIP Lenders") which agreement is attached hereto as Exhibit 1 (as it may be modified, supplemented, amended or restated from time to time, the "DIP Credit Agreement", and together with the other Loan Documents, the "DIP Loan Documents"); (c) authorizing the Debtors to use the Collateral (including cash collateral, as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral"), and granting adequate protection in connection therewith; (d) authorizing the Debtors to grant to the DIP Agent, for the benefit of the DIP Lenders, superpriority administrative claim status pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all obligations under the DIP Credit Agreement and DIP Loan Documents (the "DIP Obligations"); (e) modifying the automatic stay to the extent hereinafter set forth; and (f) setting a Final Hearing on this Motion.

### Bankruptcy Rule 4001 and Local Rule 4001-2 Concise Statements

5.      Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following are the material provisions of the DIP Credit Agreement and the Interim Order.

| **Borrower**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Deb Shops |
|---|---|
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | All Debtors other than Borrower. |
| **Administrative Agent**<br>**and Collateral Agent**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Ableco |
| **DIP Lenders**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The lenders from time to time party to the DIP Credit Agreement. |

RLF1 4081824v. 1

| | |
|---|---|
| **Commitment**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | A senior secured revolving credit facility of up to $15 million on an interim basis and $21.7 million on a final basis, subject to further approval of the DIP Lenders. (Interim Order at § 1.2; DIP Credit Agreement at §1.01, definition of "Total Revolving Credit Commitment"; DIP Credit Agreement at § 2.01) |
| **Term**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The earliest of (a) the date which is 40 days following the date of entry of the Interim Order if the Final Order has not yet been entered, (b) the date that is six (6) months from the date of the DIP Credit Agreement or such later date to which the DIP Agent consents, (c) the earlier of effective date or the substantial consummation of a confirmed plan of reorganization in these chapter 11 cases, (d) the date of a sale or liquidation of substantially all of the equity interests or assets of the Debtors, and (e) such earlier date on which all Loans and other Obligations for the payment of money shall become due and payable in accordance with the DIP Loan Documents. (DIP Credit Agreement at § 1.01, definition of "Final Maturity Date") |
| **Entities with Interest**<br>**in Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(i)* | The First Lien Administrative Agent on behalf of the First Lien Lenders, the Lee Parties, and the Second Lien Administrative Agent (if any) on behalf of the Second Lien Lenders, as each such term is defined below. (Interim Order at §§ D(iii), E(i), E(ii)) |
| **Use of Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(ii)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The Debtors shall be authorized to use Cash Collateral in accordance with the Budget (as defined below). (Interim Order at § 2.4.1) |
| **Material Terms,**<br>**Including Duration,**<br>**of Use of Cash Collateral**<br>*Bankruptcy Rule 4001(b)(1)(B)(iii)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The Debtors shall be authorized to use Cash Collateral until the termination of the DIP Agent's and the DIP Lenders' commitment to lend under the DIP Loan Documents. (Interim Order at § 2.4.1) |
| **Use of DIP Facility**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The Debtors shall be authorized to use the DIP Facility in accordance with the Budget. (Interim Order at § 1.2; DIP Credit Agreement at §§ 7.01(s), 8.01(o)) |
| **Consent to Priming Lien**<br>*Local Bankruptcy Rule*<br>*4001-2(a)(i)(G)* | The First Lien Lenders and the Lee Parties have consented to the Debtors' use of Cash Collateral, entry into the DIP Credit Agreement, and the proposed adequate protection as set forth herein. The Second Lien Lenders (as defined below), in connection with the Second Lien Intercreditor Agreement (as defined below), waived their right to object to the DIP Facility or the adequate protection provided in connection therewith. |

| | |
|---|---|
| **Interest Rates**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | DIP Facility: LIBOR Rate + 9.00% per annum or Reference Rate + 8.50% per annum (the "<u>Applicable Rate</u>"), subject to a floor of 2.50% or 3.00%, respectively. (DIP Credit Agreement at § 1.01, 2.04(a), definitions of "Reference Rate" and "LIBOR Rate")<br><br>Interest on the DIP Facility will accrue and be payable in arrears, on the first day of each month, and on the Final Maturity Date. (DIP Credit Agreement at § 2.04(c))<br><br>Default rate: Applicable Rate + 2.0% per annum. (DIP Credit Agreement at § 2.04(b)) |
| **Fees**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | Unused line fee: 0.50% per annum. (DIP Credit Agreement at § 2.06(b))<br><br>Closing fee: 1.00% times the Total Revolving Credit Commitment. (DIP Credit Agreement at § 2.06(a)) |
| **Budget**<br>*Bankruptcy Rule 4001(c)(1)(B)* | 13-week cash forecast of receipts and disbursements annexed to the DIP Credit Agreement. (Interim Order at § F(iv); DIP Credit Agreement at § 1.01, definition of "Budget") |
| **Milestones**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The Debtors' sale of all or substantially all of their assets or equity interests pursuant to section 363 of the Bankruptcy Code is subject to certain conditions being satisfied within the timeframe set forth in the DIP Credit Agreement; failure to satisfy those conditions on a timely basis will result in an Event of Default. (Interim Order at § 4, DIP Credit Agreement at 1.01; definition of "Sale Milestone" and §§ 8.01(p), 10.01(c)) |
| **Other Covenants**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | Affirmative Covenants: among other things, periodic reporting requirements, maintenance of insurance and properties, use of proceeds, sale milestones and retention of a real estate consultant. (DIP Credit Agreement at §8.01)<br><br>Negative Covenants: among other things, limitation on indebtedness, liens, capital expenditures and dividends. (DIP Credit Agreement at §8.02)<br><br>Financial Covenants: limitations on permitted variance between certain actual and budgeted amounts, and requirement that disbursements for critical vendors be made pursuant to the Budget. (DIP Credit Agreement at §8.03) |

| | |
|---|---|
| **Liens and Priorities**<br>*Bankruptcy Rules 4001(c)(1)(B)(i),*<br>*4001(c)(1)(B)(iii), 4001(c)(1)(B)(vii)*<br>*Local Bankruptcy Rules 4001-*<br>*2(a)(i)(A), 4001-2(a)(i)(G), 4001-*<br>*2(a)(ii)* | Obligations under the DIP Facility shall be senior to obligations under the Debtors prepetition credit facilities. The DIP Facility shall be afforded certain liens and claims, including superpriority claims and priming liens, on property of the estate, as described in more detail below in ¶¶ 19-23 below. Certain determinations are made with respect to the Senior Liens (as defined below). (Interim Order at § 2; DIP Credit Agreement at § 4.01) |
| **Carve-Out**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The DIP Agent's and the DIP Lenders' liens, claims and security interests in the Collateral and their Superpriority Claim (as defined below) are subject only to the payment of certain Carve Out Expenses. There are certain limitations on the use of any Carve Out Expenses. (Interim Order at § 2.3; DIP Credit Agreement at §§ 1.01 and 8.02(v)), definitions of "Agreed Administrative Expense Priorities," "Carve-Out Expenses," "Carve-Out Expense Reduction Period," and "Carve-Out Notice") |
| **Waivers of Rights**<br>*Bankruptcy Rules 4001(c)(1)(B)(v),*<br>*4001(c)(1)(B)(viii), 4001(c)(1)(B)(x)*<br>*Local Bankruptcy Rule*<br>*4001-2(a)(i)(C)* | The Debtors waive certain of their rights in connection with the DIP Facility. The time in which any statutory committee may challenge the outstanding amounts arising under the First Lien Loan Documents (the "First Lien Obligations") (excluding the Assigned Interests), the Assigned Interests, the Assigned Interest Expenses, the outstanding amounts arising under the Sponsor Loan Documents, or the Senior Liens, as each such term is defined below, is limited. The charging of certain costs and expenses under section 506(c) of the Bankruptcy Code is prohibited. (Interim Order at §§ 9, 10.6) |
| **Adequate Protection for**<br>**Prepetition Lenders**<br>*Bankruptcy Rules 4001(b)(1)(B)(iv),*<br>*4001(c)(1)(B)(ii), 4001(c)(1)(B)(vii)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | Adequate protection includes Senior Replacement Liens and the First Lien Adequate Protection Claim for the First Lien Lenders, Lee Replacement Liens and the Lee Adequate Protection Claim for the Lee Parties, and Junior Replacement Liens and the Second Lien Adequate Protection Claim for the Second Lien Lenders, as each such term is defined below. See discussion in ¶¶ 25-29 herein. (Interim Order at § 2.4) |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)*<br>*Local Bankruptcy Rule 4001-2(a)(ii)* | The DIP Credit Agreement contains certain events of default. (Interim Order at § 7; DIP Credit Agreement at Article X) |
| **Waiver or Modification**<br>**of the Automatic Stay**<br>*Bankruptcy Rule 4001(c)(1)(B)(iv)* | Subject to the five-day limitation set forth in the Interim Order, the automatic stay is vacated to permit the exercise of remedies by the DIP Agent and DIP Lenders. (Interim Order at § 7.4; DIP Credit Agreement at § 6.01(i)) |

RLF1 4081824v. 1

| | |
|---|---|
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** *Bankruptcy Rule 4001(c)(1)(B)(vii)* | Upon entry of the Interim Order (and the Final Order when entered), the DIP Liens (as defined below) shall be valid and perfected liens on, and security interests in, the Collateral, prior to all other liens on, and security interests in, the Collateral, other than the Permitted Priority Liens (as defined below). (Interim Order at § 2.1; DIP Credit Agreement at §§ 4.01(a) and 6.01(g)) |
| **Indemnification** *Bankruptcy Rule 4001(c)(1)(B)(ix)* | The Debtors agree to certain indemnities and to reimburse the Indemnitees for certain fees and expenses. (DIP Credit Agreement at § 13.15) |
| **Conditions to Borrowing** *Bankruptcy Rule 4001(c)(1)(B) Local Bankruptcy Rule 4001-2(a)(ii)* | Customary borrowing conditions, including: (a) entry of the DIP Orders, (b) evidence of required consents and approvals, and (c) the delivery of certain documents. (DIP Credit Agreement at Article VI) |
| **Liens on Causes of Action Under Chapter 5** *Bankruptcy Rule 4001(c)(1)(B)(xi)* | The DIP Agent and the DIP Lenders shall have liens on and security interests in avoidance actions brought under Sections 542, 545, 547, 548, 549 or 550 of the Bankruptcy Code, subject to the entry of the Final Order. (Interim Order at § 2.1.1; DIP Credit Agreement at § 4.01(a)) |

### Jurisdiction and Venue

6.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Prepetition Capital Structure

7.     The Debtors' prepetition credit facilities impacted by this Motion are summarized below. A complete description of the Debtors' capital structure is provided in the First Day Declaration.

**A.     First Lien Credit Agreement**

8.     Deb Shops, as borrower, is party to that certain Amended and Restated First Lien Credit Agreement, dated as of October 23, 2007 (as amended, supplemented or modified, the "First Lien Credit Agreement," and together with the other Loan Documents (as defined in the First Lien Credit Agreement), in each case as amended, supplemented or modified, collectively, the "First Lien Loan Documents"), with DSI, certain subsidiaries of DSI (the

7

"Subsidiary Guarantors"), Ableco, as successor first lien administrative agent (the "First Lien Administrative Agent"), and the several banks and other financial institutions or entities from time to time party thereto (the "First Lien Lenders"). The First Lien Loan Documents provide for a term loan facility (the "Term Loan") in the aggregate principal amount of $110 million and a revolving credit facility (the "Revolver") in the aggregate principal amount of $30 million. The Term Loan matures on April 23, 2014 and the Revolver matures on October 23, 2013. As of the Commencement Date, approximately $129.9 million was outstanding under the First Lien Loan Documents, exclusive of accrued and unpaid interest, costs, expenses, and fees owed to the First Lien Administrative Agent and First Lien Lenders.

9. To secure the obligations under the First Lien Credit Agreement, Deb Shops, DSI, and the Subsidiary Guarantors entered into a first lien guarantee and collateral agreement, dated as of October 23, 2007 (as amended, supplemented, or modified, the "First Lien Guarantee and Collateral Agreement"), pursuant to which Deb Shops, DSI, and the Subsidiary Guarantors granted to the First Lien Administrative Agent first priority liens on, and security interests in, substantially all of their respective assets (the "Prepetition Collateral") for the benefit of the First Lien Lenders (the "Senior Liens"). Pursuant to the First Lien Guarantee and Collateral Agreement, DSI and the Subsidiary Guarantors also guaranteed Deb Shops' Obligations (as defined in the First Lien Credit Agreement) under the First Lien Credit Agreement.

**B.    The Sponsor Loan Agreement and Credit Support Agreement**

10. On September 3, 2009, Deb Shops entered into that certain Sponsor Loan Agreement (as amended, supplemented, or modified, the "Sponsor Loan Agreement" and together with the other Loan Documents (as such term is defined in the Sponsor Loan Agreement), the "Sponsor Loan Documents") with Lee DSI Holdings, LLC as lender (in such

capacity, the "Sponsor Lender"), pursuant to which the Sponsor Lender agreed to extend up to $5 million in revolving credit loans to Deb Shops. As of the Commencement Date, $4.8 million had been drawn under the Sponsor Loan Documents, exclusive of accrued and unpaid interest, costs, expenses, and fees owed to the Sponsor Lender.

11.     The Sponsor Lender has a first lien security interest with respect to obligations under the Sponsor Loan Agreement pursuant to the First Lien Guarantee and Collateral Agreement. However, pursuant to that certain Sponsor Intercreditor Agreement, dated as of September 3, 2009, among the Sponsor Lender, DSI, Deb Shops, and the First Lien Administrative Agent (the "Sponsor Intercreditor Agreement"), the Sponsor Lender's right to payment under the Sponsor Loan Agreement is subordinated to the First Lien Lenders under the First Lien Credit Agreement.

12.     Also on September 3, 2009, Deb Shops entered into that certain Credit Support Agreement (as amended, supplemented, or modified, the "Credit Support Agreement") among Deb Shops, DSI, Lee DSI Holdings, LLC (in such capacity, the "Credit Support Provider," and solely in its capacity as Credit Support Provider and the Sponsor Lender, the "Lee Parties"), and the First Lien Administrative Agent. The Credit Support Agreement provides that the Credit Support Provider shall cause Citibank N.A. to issue, for the benefit of the First Lien Administrative Agent, two irrevocable standby letters of credit, in the amounts of $3 million (the "Revolving Loan LC") and $12 million (the "Term Loan LC" and, together with the Revolving Loan LC, the "Credit Support LCs"), each with a final expiry date of July 23, 2014.

13.     Pursuant to the Credit Support Agreement and subject to certain conditions therein, the First Lien Administrative Agent is entitled to draw on the Credit Support LCs in exchange for a transfer of a portion of the principal amount outstanding in connection with the First Lien Loan Documents to the Credit Support Provider in an amount equal to the

9

face amount of the Credit Support LCs. The Credit Support Agreement effectuates this transfer by providing that the proceeds of the Credit Support LCs shall be remitted, ratably, to the First Lien Lenders as consideration for the assignment by the First Lien Lenders, to the Credit Support Provider of commensurate portions of the Revolver and Term Loan. Further, the Credit Support Agreement provides, generally, that the Credit Support Provider shall not receive any recovery on account of its interest in the Term Loan or the Revolver acquired in connection with the Credit Support Agreement until the First Lien Lenders are paid in full on account of their respective interests in the Term Loan and the Revolver. Based on the occurrence of a Draw Date (as defined in the Credit Support Agreement) under the Credit Support Agreement, on or about June 15, 2011, the First Lien Lenders assigned $15 million of the First Lien Obligations to the Credit Support Provider (the "Assigned Interests"). The Assigned Interests as well as the accrued and unpaid interest, costs, expenses, and fees owed to the Credit Support Provider in connection with the Assigned Interests (the "Assigned Interest Expenses") are subordinated in right of payment to the other First Lien Obligations as set forth in the Credit Support Agreement.

14.     As of the Commencement Date, approximately $19.8 million is outstanding under the Sponsor Loan Documents and the Credit Support Agreement, exclusive of accrued and unpaid interest, costs, expenses, and fees owed to the Sponsor Lender. An additional approximately $5.2 million in accrued fees and interest is owed in connection with the Sponsor Loan Agreement and the Credit Support Agreement. Amounts owing under the Sponsor Loan Agreement and the Credit Support Agreement are first lien obligations of Deb Shops, however are contractually subordinated to the amounts owing to the other lenders under the First Lien Loan Documents pursuant to the Sponsor Intercreditor Agreement and the Credit Support Agreement, respectively.

RLF1 4081824v. 1

### C. Second Lien Credit Agreement

15. Deb Shops is also party to that certain Amended and Restated Second Lien Credit Agreement, dated as of October 23, 2007 (as amended, supplemented, or modified, the "Second Lien Credit Agreement," and together with the other Loan Documents (as defined in the Second Lien Credit Agreement), in each case as amended, supplemented, or modified, collectively, the "Second Lien Loan Documents" ) with DSI, the Subsidiary Guarantors, the financial institutions parties thereto from time to time as lenders (collectively, the "Second Lien Lenders"), Barclays Capital, as sole lead arranger and bookrunner, Crystal Capital Fund Management, L.P., as syndication agent, and Barclays Bank PLC ("Barclays") as documentation agent and as second lien administrative agent (including any successor agent(s) to Barclays Bank PLC, and in the event there is no successor agent(s) then the Second Lien Lenders functioning in such capacity as agent(s), the "Second Lien Administrative Agent"). The Second Lien Loan Documents provide for a term loan facility in the aggregate principal amount of $45 million, which matures on October 23, 2014. As of the Commencement Date, approximately $58.6 million was outstanding under the Second Lien Loan Documents, including payment-in-kind interest.

16. To secure the obligations under the Second Lien Credit Agreement, Deb Shops, DSI, and its subsidiaries entered into a second lien guarantee and collateral agreement, dated as of October 23, 2007 (as amended, supplemented, or modified, the "Second Lien Guarantee and Collateral Agreement"), pursuant to which Deb Shops, DSI, and the subsidiaries of DSI party thereto granted to the Second Lien Administrative Agent a second priority lien on, and security interests in, the Prepetition Collateral (the "Junior Liens"). Pursuant to the Second Lien Guarantee and Collateral Agreement, DSI and certain subsidiaries of DSI guaranteed Deb

11

Shops' Obligations (as defined in the Second Lien Credit Agreement) under the Second Lien Credit Agreement.

### D. Intercreditor Agreement

17.     The relative priorities of liens held by the First Lien Lenders and the Second Lien Lenders are subject to that certain Amended and Restated Intercreditor Agreement, dated as of October 23, 2007 (as amended, supplemented, or modified, the "Second Lien Intercreditor Agreement"), by and among Ableco (as successor to Barclays), in its capacity as the First Lien Administrative Agent, the Second Lien Lenders in their respective capacity as Second Lien Administrative Agent, and Deb Shops. In accordance with the Second Lien Intercreditor Agreement, the First Lien Lenders and the Second Lien Lenders agreed, among other things, that (a) liens on any collateral securing the obligations under the First Lien Loan Documents will be senior in all respects and prior to any liens on collateral securing any obligations under the Second Lien Loan Documents, (b) liens on any collateral securing the obligations under the Second Lien Loan Documents shall be junior and subordinate in all respects to all liens on collateral securing any obligations under the First Lien Loan Documents, and (c) if the liens securing the obligations under the First Lien Loan Documents are avoided under section 544 or 548 of the Bankruptcy Code pursuant to a final and non-appealable order, the subordination provisions set forth in clause (a) and (b) above will no longer apply to liens securing the obligations under the Second Lien Loan Documents, but only to the extent of such avoidance.

RLF1 4081824v. 1

**DEB's Proposed Postpetition Financing**

**A.      The DIP Facility and Use of Cash Collateral Are
Critical to Continued Operation of the Business**

18.      As further described in the First Day Declaration, the Debtors finance their operations with cash from operating activities and a variety of financing arrangements. Although the Debtors' businesses typically generate sufficient cash to fund their operations on a long-term basis, in the short-term the Debtors will need the liquidity provided by the proposed postpetition financing in addition to the use of the cash that they generate to, among other things, fund their operations, pay the costs and expenses of administering these chapter 11 cases, and obtain additional trade support. To further address their working capital needs and fund these chapter 11 cases, the Debtors also require the immediate use of Cash Collateral. The use of Cash Collateral will provide the Debtors with the additional capital necessary to operate their businesses, pay their employees, and maximize enterprise value.

**B.      Selection of DIP Lenders, DIP Facility
Negotiations, and Proposed DIP Facility**

19.      As set forth in the *Declaration of Bernard Douton in Support of Debtors' Motion for Interim and Final (I) Authority to Obtain Postpetition Financing; (II) Authority to Use Cash Collateral; (III) Authority to Grant Security Interests and Superpriority Claims; (IV) Authority to Provide Adequate Protection; and (V) Modification of the Automatic Stay,* filed contemporaneously herewith (the "Rothschild Declaration"), prior to the commencement of the Debtors' chapter 11 cases, the Debtors and Rothschild Inc. ("Rothschild"), their investment banker and financial advisor, surveyed various sources of postpetition financing, including financing from the First Lien Lenders and unrelated third parties. The Debtors and Rothschild approached various parties having the capability of providing a facility of the size required, but were unable to obtain any postpetition financing outside of the one proposed by the DIP Lenders.

13

20.     In exploring their options, the Debtors recognized that the obligations owed to the First Lien Lenders are secured by substantially all of the Debtors' real and personal property, such that either (a) the liens of the First Lien Lenders would have to be primed to obtain postpetition financing, or (b) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the First Lien Lenders. The First Lien Lenders advised the Debtors that they would not grant a blanket consent to be primed by another lender group; however, a subset of the First Lien Lenders indicated a willingness to negotiate terms of a postpetition financing facility which the Debtors believed other First Lien Lenders would find acceptable.

21.     The DIP Facility permits the Debtors to borrow up to $15 million on an interim basis and up to $21.7 million on a final basis, subject to further approval of the DIP Lenders. The DIP Agent, on behalf of the DIP Lenders, shall receive (a) valid and perfected first priority security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtors may have, but subject to the Carve Out Expenses and the Permitted Priority Liens, in and upon all of the Collateral (collectively, the "DIP Liens") and (b) an allowed superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "Superpriority Claim") which shall be subject only to payment of the Carve Out Expenses.

22.     The Debtors and the DIP Lenders engaged in extensive, arm's length negotiations with respect to the terms and conditions of the DIP Loan Documents. The DIP Lenders made the only proposal to the Debtors for postpetition financing. The material terms and conditions of the DIP Facility are summarized in paragraph 5 of this Motion. The Debtors and the DIP Lenders have agreed upon a budget (the "Budget," annexed hereto as Exhibit 2) projecting cash flow for the next thirteen weeks. The DIP Loan Documents permit the Debtors to draw on the DIP Facility to make any disbursement specifically provided for in the Budget.

14

## C.    Proposed Adequate Protection for Prepetition Secured Lenders

23.    Pursuant to sections 361 and 363 of the Bankruptcy Code, as adequate protection the First Lien Administrative Agent, for the benefit of the First Lien Lenders, the Lee Parties, and the Second Lien Administrative Agent, for the benefit of the Second Lien Lenders, shall be granted valid, binding, enforceable and perfected replacement liens upon and security interests in all of the Collateral to protect against a diminution in the value of the Prepetition Collateral, from and after the Commencement Date, resulting from (a) the Debtors' use of the Prepetition Collateral and the Cash Collateral, (b) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, (c) the incurrence of the DIP Obligations, and (d) the subordination of the Senior Replacement Liens (as defined below) to the Carve Out Expenses.

24.    The replacement liens provided for the benefit of the First Lien Lenders (the "Senior Replacement Liens"), the Lee Parties (the "Lee Replacement Liens"), and the Second Lien Lenders (the "Junior Replacement Liens") shall be junior and subordinate to (a) the DIP Liens, (b) the Permitted Priority Liens, (c) the Carve Out Expenses, and (d) any other liens permitted to be senior to the Senior Liens by the First Lien Loan Documents. The Lee Replacement Liens and the Junior Replacement Liens shall further be junior and subordinate to (a) the Senior Liens, (b) the Senior Replacement Liens, and (c) all other liens and security interests granted for the benefit of DIP Lenders and the First Lien Lenders in the Collateral. In addition, the Junior Replacement Liens shall be junior and subordinate to (a) the Lee Replacement Liens, and (b) any other valid, perfected, enforceable and non-avoidable lien that is senior to the Junior Liens.

25.    The Lee Parties shall have no right to seek or exercise any rights or remedies in respect of the Lee Replacement Liens until all DIP Obligations have been indefeasibly paid and satisfied in full in accordance with the DIP Loan Documents and the

15

Interim Order, and until the "Payment in Full Requirements" (as such term is defined in the Sponsor Loan Documents and/or the Credit Support Agreement, as applicable) are satisfied. The Second Lien Administrative Agent and the Second Lien Lenders shall have no right to seek or exercise any rights or remedies in respect of the Junior Replacement Lien until all DIP Obligations have been indefeasibly paid and satisfied in full in accordance with the DIP Loan Documents and the Interim Order, and until the Discharge of First Lien Obligations (as such term is defined in the First Lien Loan Documents) has occurred.

26.     To the extent that the Senior Replacement Liens are insufficient protection against the diminution in value of the Prepetition Collateral, the First Lien Administrative Agent, for the benefit of the First Lien Lenders shall receive, pursuant to section 507(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of these chapter 11 cases and any successor cases (including the conversion of any of the Cases to a chapter 7 proceeding, the "Successor Cases") subject to section 726 of the Bankruptcy Code (the "First Lien Adequate Protection Claim"). The First Lien Adequate Protection Claim shall be junior and subordinate only to (a) the right of payment of the DIP Obligations owing to the DIP Lenders, (b) the Superpriority Claim granted for the benefit of the DIP Lenders, and (c) the Carve Out Expenses.

27.     The Lee Parties and the Second Lien Administrative Agent, for the benefit of the Second Lien Lenders, shall receive junior superpriority administrative expense claims in each of the chapter 11 cases and any Successor Cases subject to section 726 of the Bankruptcy Code (with respect to Lee, the "Lee Adequate Protection Claim," and with respect to the Second Lien Lenders, the "Second Lien Adequate Protection Claim"). The Lee Adequate Protection Claim and the Second Lien Adequate Protection Claim shall be junior and subordinate to (a) the right of payment of the DIP Obligations owing to the DIP Lenders, (b) the Superpriority Claim

16

granted for the benefit of itself and the DIP Lenders, (c) the Carve Out Expenses, and (d) the First Lien Adequate Protection Claim. The Second Lien Adequate Protection Claim shall further be junior and subordinate to the Lee Adequate Protection Claim.

**D.  Consent by the First Lien Lenders and the Lee Parties, and a Waiver of the Right to Object by the Second Lien Lenders to Debtors' Use of Cash Collateral, Entry into the DIP Credit Agreement, and Proposed Adequate Protection**

28.    The terms of the First Lien Loan Documents, the Credit Support Agreement and the Sponsor Loan Documents, and the Second Lien Loan Documents give each of the First Lien Lenders, the Lee Parties, and the Second Lien Lenders, respectively, security interests in the Prepetition Collateral, including Cash Collateral. The First Lien Lenders, in accordance with the terms of the First Lien Loan Documents, and the Lee Parties, in accordance with the terms of the Credit Support Agreement and the Sponsor Loan Documents, have consented to the Debtors' use of Cash Collateral, entry into the DIP Credit Agreement, and the proposed adequate protection as set forth herein.

29.    Notably, the Credit Support Agreement and the Sponsor Intercreditor Agreement cap the amount of debtor in possession financing that may be incurred where, as here, the liens in connection with the proposed debtor in possession financing prime those held by the Credit Support Provider and the Sponsor Lender. The Credit Support Agreement sets forth a cap of $12,765,952 (the "Credit Support DIP Cap") and the Sponsor Intercreditor Agreement provides for a cap of $17,765,952 (the "Sponsor Loan DIP Cap"). The Credit Support Provider and the Sponsor Lender, respectively, have agreed to waive the Credit Support DIP Cap and the Sponsor Loan DIP Cap in connection with the DIP Facility.

30.    The Second Lien Lenders prenegotiated their rights with respect to the Debtors' use of Cash Collateral, ability to enter into agreements such as the DIP Credit

17

Agreement, and obligation to provide adequate protection. Specifically, the Second Lien Intercreditor Agreement provides that in the event of a chapter 11 filing, the Second Lien Lenders will raise no objection to the use of cash collateral, or any financing under section 364 of the Bankruptcy Code or any similar bankruptcy provision, provided, however, that (a) the terms of the use of cash collateral and debtor in possession financing are commercially reasonable, (b) the Second Lien Lenders and the Second Lien Administrative Agent retain the right to object to any ancillary agreements or arrangements regarding the use of cash collateral or debtor in possession financing that are materially prejudicial to their respective interests, (c) the order authorizing the use of cash collateral and the debtor in possession financing documentation do not expressly require the liquidation of the Prepetition Collateral prior to a default under such documents, and (d) the debtor in possession financing does not compel the Debtors to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the debtor in possession financing documentation or a related document.

31.     The Second Lien Intercreditor Agreement also addresses the scenario where, as here, the liens in connection with the proposed debtor in possession financing prime those held by the Second Lien Lenders. In such a circumstance, the Second Lien Lenders agreed to subordinate their liens securing the Prepetition Collateral to the liens securing the debtor in possession financing, and waive their rights to request adequate protection or any other relief in connection therewith, provided, however, that the amount of the debtor in possession financing not exceed $21,742,725.00 (the "Second Lien DIP Cap") and that the requirement described in paragraph 30(b) is satisfied.

32.     The Second Lien Intercreditor Agreement provides a narrow exception to the adequate protection waiver, and specifies that in the event that the First Lien Lenders receive adequate protection in connection with the Debtors' use of cash collateral or debtor in possession

financing, then the Second Lien Lenders may also request adequate protection in the form of a lien on this additional collateral, provided, however, that such liens will be subordinated on the same basis as the liens securing Deb Shops' obligations under the Second Lien Loan Documents.

33.     The terms and conditions of the Debtors' use of Cash Collateral and the DIP Facility are commercially reasonable. As set forth in the Rothschild Declaration, such terms and conditions were negotiated extensively and at arm's length by well-represented, independent parties in good faith. The Debtors have negotiated the best terms available to obtain the funding they need to maintain sufficient liquidity and preserve their assets over the course of their chapter 11 cases. Rothschild determined that the terms governing the Debtors' use of Cash Collateral and the DIP Facility are consistent with the terms generally provided in other similar chapter 11 cases. Rothschild has extensive experience in providing financial advisory and investment banking services to financially distressed companies and representing both debtors and lenders in the procurement and provision, respectively, of postpetition financing.

34.     Further, the Debtors have not entered into any ancillary agreements or arrangements regarding their use of Cash Collateral or the DIP Facility, no less ones that are materially adverse to the interests of the Second Lien Lenders. The DIP Orders and the DIP Credit Agreement do not expressly require the liquidation of the Prepetition Collateral prior to a default. The Debtors are also not compelled to seek confirmation of a specific plan of reorganization for which all or substantially all of the material terms are set forth in the DIP Orders, the DIP Credit Agreement, or a related document, and the DIP Facility is within the Second Lien DIP Cap. Further, while no request has been received, the Debtors are providing the Second Lien Lenders with the Junior Replacement Liens as well as the Second Lien Adequate Protection Claim.

19

## Basis for Relief Requested

### A.    DIP Facility Should Be Authorized

35.    Approval of the DIP Credit Agreement will provide the Debtors with immediate access to financing and allow them to pay current and ongoing operating expenses, including postpetition wages and salaries, and utility and vendor costs, and obtain additional trade support, among other things, in all cases subject to the Budget.  Unless these expenditures are made, the Debtors may be forced to cease operations, which would result in irreparable harm to their businesses.  The credit provided under the DIP Facility will enable the Debtors to continue to satisfy the needs of their customers, pay their employees, and operate their businesses in the ordinary course, and in an orderly and reasonable manner, which will preserve and enhance the value of their estates for the benefit of all parties in interest.  Further, it will provide confidence to the Debtors' creditors that will enable and encourage them to continue their critical relationships with the Debtors.  Finally, the implementation of the DIP Credit Agreement will be viewed favorably by the Debtors' employees and customers.

36.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).  Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (a) the debtor is unable to obtain such credit otherwise, and (b) there is adequate

20

protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

37.     Despite their efforts, the Debtors have been unable to (a) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1), or (iv) without granting priming liens pursuant to section 364(d), or (b) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. In early June 2011, Rothschild contacted eight potential lenders regarding a potential DIP facility for the Debtors. However, given that substantially all of the Debtors' assets are encumbered, no entity was willing to provide postpetition financing other than the DIP Lenders. Given the urgency of the filing of these chapter 11 cases and the critical need for postpetition financing, the Debtors determined that they could not obtain postpetition financing without priming the First Lien Lenders, the Lee Parties and the Second Lien Lenders.

38.     Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtors negotiated the DIP Facility with the DIP Lenders extensively and at arm's length. Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith. See, e.g., Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1089-90 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage

the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); see also In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985); Funding Sys. Asset Mgmt. Corp. v. Key Capital Corp. (In re Funding Sys. Asset Mgmt. Corp.), 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

39.     Section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. In re Snowshoe Co., 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re 495 Central Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most banks lend money only in return for a senior secured position"); In re Aqua Assocs., 123 B.R. 192, 197 (Bankr. E.D. Pa. 1991) (debtor's "evidence of a credit quest" adequately established that some degree of priming loan was necessary for the debtor to obtain funding).

40.     The Debtors submit that the circumstances of these cases require the Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Facility reflects the exercise of their sound business judgment. The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively and at arm's length. Further, consummation of the DIP Facility is in the best interest of the Debtors' estates, their creditors, and all parties in interest in these chapter 11 cases and is consistent with the Debtors' exercise of their fiduciary duty. Accordingly, the DIP Lenders and all obligations incurred in connection with the DIP Facility should be afforded the benefits of section 364(e) of the Bankruptcy Code.

41.     This Court has granted similar relief under similar circumstances in several cases. See, e.g., In re Aleris Int'l, Inc., Case No. 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009) [Docket No. 299]; In re Vertis Holdings, Inc., Case No. 08-11460 (CSS) (Bankr. D. Del. Aug. 13, 2008) [Docket No. 161]; In re LandSource Cmty. Dev. LLC, Case No. 08-11111 (KJC) (Bankr. D. Del. July 19, 2008) [Docket No. 306]; In re Linens Holding Co., Case No. 08-10832 (CSS) (Bankr. D. Del. May 28, 2008) [Docket No. 476]; In re Hoop Holdings, Inc., Case No. 08-10544 (BLS) (Bankr. D. Del. Apr. 16, 2008) [Docket No. 229]; In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. Mar. 7, 2008) [Docket No. 182]; In Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008) [Docket No. 350]; In re Radnor Holdings Corp., Case No. 06-10894 (PJW) (Bankr. D. Del. Sept. 22, 2006) [Docket No. 278]; In re Comdial Corp., Case No. 05-11492 (MFW) (Bankr. D. Del. June 28, 2005) [Docket No. 118]; In re Ultimate Electronics, Inc., Case No. 05-10104 (PJW) (Bankr. D. Del. Feb. 14, 2005) [Docket No. 195].

B.      **Use of Cash Collateral Should Be Authorized**

42.     The Debtors require the immediate use of Cash Collateral to continue their operations and preserve the value of their assets. Specifically, the Debtors seek to use Cash Collateral to (a) maintain their operations consistent with prepetition practices, (b) pay certain prepetition obligations as further described in the Debtors' motions filed substantially contemporaneously herewith, and (c) pay disbursements more fully described in the Budget.

43.     Section 363 of the Bankruptcy Code governs the Debtors' use of cash collateral. Under section 363(c)(2), a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes the use, sale or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(a) defines "cash collateral" as follows:

[C]ash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a).

44.     It is universally acknowledged that a debtor's cash "is the life's blood of the business," and the bankruptcy court must ensure that such life's blood "is available for use, even if to a limited extent." In re Mickler, 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). Courts repeatedly have recognized that use of cash collateral is appropriate where necessary, as it is here, to preserve a debtor's ability to reorganize and thus maximize the value of an estate. See, e.g., MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1398 (10th Cir. 1987) (permitting debtor to use cash collateral to expand operations after finding there was not a significant risk that secured creditor's interest would diminish); Chrysler Credit Corp. v. George Ruggiere Chrysler-Plymouth, Inc. (In re George Ruggiere Chrysler-Plymouth, Inc.), 727 F.2d 1017, 1019 (11th Cir. 1984) (allowing debtor to use cash collateral after noting that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.") In re Dynaco, 162 B.R. 389, 394 (Bankr. D. N.H. 1993), citing Stein v. U.S. Farmers Home Admin. (In re Stein), 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982) (granting a motion for the use of cash collateral and stating that "the purpose of Chapter 11 is to rehabilitate debtors and generally, access to cash collateral is necessary in order to operate a business").

45.     Absent the use of the Cash Collateral, the Debtors will not have sufficient working capital and financing to carry on the operation of their businesses as going concerns. Indeed, without the use of Cash Collateral, the continued operation of the Debtors' businesses may not be possible, and serious and irreparable harm to the Debtors and their estates may occur. This result would be in diametrical opposition to the rehabilitative purpose of chapter 11. Consequently, the use of Cash Collateral is critical to preserve and maintain the value of the Debtors' businesses. This in turn will extract the maximum value from the Debtors' assets.

46.     As discussed above, the First Lien Lenders and the Lee Parties have agreed to the Debtors' use of Cash Collateral. The Second Lien Lenders, pursuant to the terms of the Second Lien Intercreditor Agreement, are deemed to consent to the Debtors' use of Cash Collateral. The adequate protection described herein is being provided in accordance with the Debtors' agreement with the First Lien Lenders and the Lee Parties, and the prenegotiated rights of the Second Lien Lenders. Accordingly, the Debtors' request to use Cash Collateral in the operation of their businesses and administration of these chapter 11 cases should be approved.

C.     **The Proposed Adequate Protection Should Be Authorized**

47.     Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens, and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. In re O'Connor, 808 F.2d at 1396-97 (citing Martin v. United States (In re Martin), 761 F.2d 472, 474 (8th Cir. 1985)); Metro. Life Ins. Co. v. Monroe Park (In re Monroe Park), 17 B.R. 934, 940 (D. Del. 1982) (citations omitted); In re

25

Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest Assocs., 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992) (citing Martin, 761 F.2d at 474); In re Selby Farms, Inc., 15 B.R. 372, 374 (Bankr. S.D. Miss. 1981); Kimbrough Inv. Co. v. Royal d'Iberville Corp. (In re Royal d'Iberville), 10 B.R. 37, 39 (Bankr. S.D. Miss. 1981) ("Opinions as to what is adequate protection must be determined on a case-by-case basis and opinions will vary greatly from court-to-court because adequate protection is not defined in the Bankruptcy Code."). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

48. As described above, as adequate protection the First Lien Administrative Agent (for the benefit of the First Lien Lenders), the Lee Parties, and the Second Lien Administrative Agent (for the benefit of the Second Lien Lenders) shall be granted, respectively, Senior Replacement Liens, Lee Replacement Liens, and Junior Replacement Liens to secure against potential diminution in the value of the Prepetition Collateral. To the extent that the Senior Replacement Liens are insufficient protection against the diminution in value of the Prepetition Collateral, the First Lien Lenders, the Lee Parties, and the Second Lien Lenders shall receive, respectively, the First Lien Adequate Protection Claim, the Lee Adequate Protection Claim, and the Second Lien Adequate Protection Claim pursuant to section 507(b) of the Bankruptcy Code.

49. The First Lien Lenders and the Lee Parties consented to the adequate protection proposed herein. The Second Lien Lenders, in connection with the Second Lien Intercreditor Agreement, waived their right to object to the DIP Facility or the adequate

26

protection provided in connection therewith. Without access to the proposed DIP Facility and use of the Cash Collateral, the Debtors' liquidity will quickly dry up and the Debtors could be forced to cease operations in a non-orderly manner. In contrast, the value of the Prepetition Collateral is preserved by allowing the Debtors access to Cash Collateral and the DIP Facility because it ensures the uninterrupted continuance of the Debtors' operations. Accordingly, the adequate protection proposed herein is fair and reasonable and sufficient to satisfy the requirements of Bankruptcy Code sections 363(c)(2) and (e).

D. **The Automatic Stay Should Be Modified on a Limited Basis**

50. To implement the foregoing successfully, the Debtors seek a waiver of the fourteen-day stay under Bankruptcy Rule 4001(a)(3).

E. **Interim Approval Should Be Granted**

51. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit may not be commenced earlier than fourteen days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

52. The Debtors request that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtors to use Cash Collateral and borrow up to $15 million under the DIP Credit Agreement on an interim basis, pending entry of the Final Order, to maintain and finance the ongoing operations of the Debtors and avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule the Final Hearing.

53. The Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Debtors do not have sufficient funds with which to operate their businesses on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed. The availability of the Interim DIP Facility will provide necessary assurance to the Debtors' vendors, factors, employees, and clients, enabling the Debtors to meet their near-term obligations. Failure to meet these obligations and to provide these assurances would likely have a long-term negative impact on the value of the Debtors' businesses, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtors. Accordingly, the interim relief requested is critical to preserving and maintaining the value of the Debtors' businesses and maximizing recoveries for all stakeholders.

## Notice

54. No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases. The Debtors have provided notice of this Motion by facsimile and/or overnight mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the DIP Agent; (c) counsel to the First Lien Administrative Agent; (d) the First Lien Lenders; (e) counsel to the Lee Parties; (f) the Second Lien Administrative Agent; (g) the Second Lien Lenders; (h) each of the Debtors' creditors holding the thirty largest unsecured claims (on a consolidated basis) and (i) the Internal Revenue Service. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Del. Bankr. L.R. 9013-1(m). Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

28

**No Previous Request**

55.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  June 26, 2011
        Wilmington, Delaware

        RICHARDS, LAYTON & FINGER, P.A.
        Mark D. Collins (No. 2981)
        Jason M. Madron (No. 4431)
        One Rodney Square
        920 North King Street
        Wilmington, Delaware 19801
        Telephone:  (302) 651-7700
        Facsimile:  (302) 651-7701

        -and-

        WEIL, GOTSHAL & MANGES LLP
        Michael F. Walsh (*pro hac vice* pending)
        Stephen A. Youngman (*pro hac vice* pending)
        767 Fifth Avenue
        New York, New York 10153
        Telephone:  (212) 310-8000
        Facsimile:  (212) 310-8007

        *Proposed Attorneys for Debtors*
        *and Debtors in Possession*